Dupuy G. Warrick and Violette G. Warrick, husband and wife v. Commissioner.
Dupuy v. Commissioner
Docket No. 15275.
United States Tax Court
1948 Tax Ct. Memo LEXIS 155; 7 T.C.M. (CCH) 398; T.C.M. (RIA) 48120; June 25, 1948
*155 Petitioner, an attorney, represented certain stockholders and creditors of a company in receivership for which the court, in December, 1936, awarded him a fee of $125,000. This fee was received by him in 1940. Prior to the award, petitioner's services covered a period of less than five years. Subsequent to the award, other services were performed. Held, under the facts and circumstances, petitioner's services subsequent to 1936 were not rendered in earning the fee allowed by the court, and section 107, Internal Revenue Code, may not be applied in computing the tax for 1940 attributable to the fee. Albert F. Hillix, Esq., and John E. Park, Esq., Bryant Bldg., Kansas City, Mo., for the petitioners. Harlow B. King, Esq., and Gene W. Reardon, Esq., for the respondent. ARNOLD Memorandum *156 Findings of Fact and Opinion The respondent determined a deficiency in income tax of the petitioners for the year 1940 in the amount of $38,972.03. The sole issue is whether section 107 of the Internal Revenue Code may be applied in computing the petitioners' tax attributable to a fee of $125,000 received by Dupuy G. Warrick in 1940 for legal services. A stipulation of facts, documentary evidence and oral testimony were submitted from which we make the following Findings of Fact Dupuy G. Warrick, hereinafter referred to as the petitioner, and Violette G. Warrick are husband and wife. They reside in Kansas Ctiy, Missouri. They filed a joint income tax return for the calendar year 1940, prepared on the cash receipts and disbursements basis, with the collector of internal revenue at Kansas City, Missouri. In January 1932 petitioner was employed by Frank P. Parish, then president of Missouri-Kansas Pipe Line Company, to assist him and certain stockholders and creditors of the company in the prosecution of certain claims against Columbia Gas & Electric Corporation and its subsidiary, Columbia Oil & Gasoline Corporation, for violation of the anti-trust laws. *157 The Missouri-Kansas Pipe Line Company, hereinafter referred to as Mokan, was a holding company. Its principal assets consisted of various stocks, bonds, and unsecured claims. The Panhandle Corporation, a wholly owned subsidiary of Mokan, owned certain notes and one-half of the outstanding capital stock of Panhandle Eastern Pipe Line Company, hereinafter referred to as Panhandle Eastern. The Columbia Gas and Electric Corporation and Columbia Oil & Gasoline Corporation, hereinafter referred to as the Columbia companies, owned the other one-half of Panhandle Eastern's outstanding stock. Mokan's indirect ownership of Panhandle Eastern represented a $13,000,000 or $14,000,000 investment. Panhandle Eastern possessed large and valuable natural gas properties in the Panhandle of Texas and it also was the owner of a 250-mile pipe line used to transport the gas to the Illinois-Indiana State line. There had been a struggle between the Columbia companies and Mokan over the policies to be pursued by the management of Panhandle Eastern, which management was under the control of the Columbia companies. As a result, the bonds and notes of Panhandle Eastern were in default, and it was in need *158 of expansion of its facilities for the distribution of its natural gas supply. Mokan, failing to realize income upon its investment in Panhandle Eastern, became insolvent and was in danger of losing its entire investment in Panhandle Eastern. Consequently, Mokan was forced into receivership and it was placed under the jurisdiction of a Court of Chancery in the State of Delaware. Receivers were appointed March 18, 1932. Certain notes of Mokan being in default, foreclosure proceedings were instituted resulting in the loss by the receivership estate, during the early part of the year 1933, of three-eighths of Mokan's one-half ownership of Panhandle Eastern. Thereupon, the receivers asserted a claim for damages against the Columbia companies, based upon the latters' purported violation of the antitrust laws of the United States in connection with its control over Panhandle Eastern. The receivers carried on negotiations with the Columbia companies which resulted in an offer by the Columbia companies, about April 1934, of about $300,000 to the receivers in settlement of Mokan's asserted claims for damages. The receivers recommended acceptance of the offer. The petitioner, as counsel *159 for certain independent stockholders, and New York counsel, representing a New York stockholders' committee, strenuously and successfully opposed the acceptance of such offer. The Chancery Court duly rejected the $300,000 proposal of settlement. Thereafter, in 1935, the receivers filed a suit for damages against the Columbia companies in New York under the anti-trust laws of the United States. The receivers were represented by New York counsel in this litigation. Also, the United States instituted a criminal anti-trust suit against the Columbia companies to enjoin and restrain their control over Panhandle Eastern. The petitioner, as counsel for certain stockholders of Mokan, had been exploring settlement possibilities with the Columbia companies, and in 1935 and 1936, actively negotiated with the Columbia companies. The activities of petitioner resulted in another proposal of settlement on January 31, 1936. The receivers rejected this offer of settlement. Thereupon, the petitioner succeeded in causing the Columbia companies to resubmit its latter proposal of settlement to the receivers, and then the petitioner, on March 9, 1936, brought the matter of acceptance of the settlement *160 offer directly before the Chancery Court by filing an appropriate petition. The terms of the settlement were modified and improved upon by the receivers and by counsel representing the New York stockholders committee, and thereafter the Chancery Court on April 29, 1936, authorized and directed the receivers to accept the Columbia offer of settlement as modified. Pursuant to the terms of the settlement agreement, the receivers, inter alia, cancelled their claims against the Columbia companies, and in consideration therefor the Columbia companies caused the said three-eights of the capital stock of Panhandle Eastern to be restored to Mokan and paid the receivership estate $300,000 in cash. This settlement converted the receivership estate from an insolvent condition into one of solvency where it now possessed net assets of some $12,000,000. Under the terms of the settlement agreement, Panhandle Eastern was to issue 160,000 additional shares of common stock for necessary additional financing and the receivers were to distribute to the common and Class B stockholders of Mokan warrants evidencing rights to subscribe for one-half of such issue. One of the factors that induced the Columbia *161 companies to enter into the foregoing settlement agreement was the procurement in August 1935, by petitioner and Frank Parish, a stockholder and former president of Mokan, of a profitable contract for Panhandle Eastern to supply its available natural gas to the City of Detroit. This contract promised to solve the marketing problem for the available Panhandle Eastern gas and thus eliminate a cause of the controversy that had existed between Mokan and the Columbia companies. Provision was made in the settlement agreement for the financing of an extension of Panhandle Eastern pipe line in order to enable it to supply its natural gas to the City of Detroit. The petitioner's services in negotiating this contract were engaged by one Walter Beckjord, vice-president and general manager of Columbia Gas & Electric Company. A fee of $125,000 was paid to petitioner and Parish for the services rendered in procuring the Detroit contract, the petitioner receiving $37,500 thereof during the year 1936, $25,000 from the MichiganGas Transmission Company, a corporation wholly owned by Columbia and which owned a line connecting Panhandle Eastern's line with Detroit, and $12,500 from Panhandle Eastern. *162 In 1937 the receivers paid all claims allowed by the Chancellor with the exception of the allowance to petitioner. The receivers opposed, contested, and withheld payment of the Chancellor's allowance of compensation and expenses to petitioner on the ground, among others, that petitioner had been in fact representing the Columbia companies in the settlement negotiations. Litigation ensued over the question of payment of the Chancery Court's allowance to petitioner. On April 1, 1940, the Supreme Court of Delaware confirmed the Chancellor's allowance of petitioner's claim and ordered the receivers to make payment. In accordance therewith, the receivers, in December 1940, paid petitioner the sum of $125,000 and the expense allowance of $7,883.14. Petitioner, between January and September 1937, purchased some Mokan stock. Under the terms of the settlement, 80,000 shares of a new issue of Panhandle Eastern stock were to be offered the stockholders of Mokan at $25 per share and thereafter were to be taken up by Columbia Oil & Gasoline Corporation to the extent not purchased by Mokan's stockholders. The stock had a market value of some $50 to $60 per share. The receivers did not immediately *163 comply with the provision requiring issuance of the warrants to Mokan's stockholders and one Maguire instituted a suit in 1937 to modify the terms of the settlement to permit Mokan to distribute the stock rights instead of a direct distribution to its stockholders. Petitioner appeared in court and successfully opposed this modification. Later, on an ex parte order, the warrants were turned over to the company and its new officers instead of the stockholders, and in June 1938 petitioner resorted to the court to set aside the ex parte order and regain control of the warrants for distribution by the receivers in accordance with the original order. Litigation in this connection was had in 1938 and 1939, and petitioner was sustained. Petitioner performed services in preparing a plan for distribution of the warrants in 1939. The warrants were distributed to the stockholders in September or October of 1939. Petitioner, as a stockholder, received his allocable share thereof. The opinion of the Chancellor of the Court of Chancery of the State of Delaware filed in the receivership proceeding on December 18, 1936, states, in part: "The following opinion was filed by the Chancellor in disposing *164 of petitions for allowances for compensation for services claimed to have been rendered and expenses to have been incurred in connection with the receivership of Missouri-Kansas Pipe Line Company. "THE CHANCELLOR: Receivers were appointed by this court for Missouri-Kansas Pipe Line Company, hereinafter referred to as Mokan, on March 16, 1932, on the ground of insolvency, under paragraph 3883 of the Revised Code of 1915. * $ *
"The order approving the settlement directed that all persons asserting any right to compensation for services and expenses in connection with the receivership should file their claims on or before a designated day. * * *
"* * * On January 31, 1936, a settlement of the same controversies with the Columbia companies which the receivers' negotiations of May 23, 1934, had attempted to adjust, was negotiated by Dupuy G. Warrick. This settlement, after certain improvements in its terms were secured by the receivers, was authorized by the court after notice to all parties interested. Instead of yielding to the estate a total of securities in the estimated value of three hundred thousand dollars, as did the receivers' negotiations, the new settlement *165 yielded securities of an estimated value of twelve million dollars plus and three hundred thousand dollars in cash. In view of this situation, it is clear that those parties in interest who incurred expense in successfully opposing the settlement negotiated by the receivers, may be very properly described as having done so in the course of preserving the common fund for the benefit of all who were interested therein. Reimbursement should be allowed for that expense. The third major problem of receivership was whether or not the settlement which was negotiated by Warrick and submitted to the receivers on January 31, 1936, with the improving modifications which they secured, should be authorized. After due hearing it was authorized by order of this court on April 29, 1936. * * *
"With respect to the third factor, viz., the negotiation of the Detroit contract, no one is claiming compensation on account of that. As a matter of fact it has already been paid for in the amount of one hundred and twenty-five thousand dollars by the Columbia companies. * * *
"24. Dupuy G. Warrick, attorney for Parish and others, petitions for an allowance of two hundred and fifty thousand dollars *166 as compensation and $7,883.14 as expenses. This claim is based on Warrick's services in negotiating the settlement with the Columbia companies in 1936. The solicitors for the receivers contend that as the settlement which was finally approved was not the one Warrick negotiated, it cannot be said that Warrick negotiated any settlement that the court should recognize. This is thoroughly technical. The settlement which was finally approved was the Warrick settlement with some improving modifications which the receivers succeeded in having added to it. The substance of the settlement was the result of Warrick's work. There may have finally been a settlement negotiated by some one if Warrick had never busied himself in behalf of the stockholders. It has been said by some one in the course of these proceedings that events had so shaped the Mokan-Columbia situation that a settlement was inevitably bound to emerge in due time. Perhaps so. Such things however are not self-creative. Someone must bring them forth. No one other than Warrick addressed his efforts to the culminating task. While others were standing by, Warrick was active. He accomplished the result. He is entitled to substantial *167 compensation. I shall allow him one hundred and twenty-five thousand dollars as compensation and expenses as asked for in the sum of $7,883.14." The fee of $125,000 received by petitioner in 1940 was paid him for services rendered during a period of less than five calendar years. Opinion ARNOLD, Judge: The petitioner received in 1940 a fee of $125,00 for legal services performed over a period of some years prior thereto and in filing his return for 1940 computed his tax attributable to that fee in accordance with section 107 of the Internal Revenue Code. [1] The respondent determined that section 107 was not applicable, and contends: (1) that the period from the beginning to the completion of the services was less than five years; and (2) that the petitioner received in 1940 less than 95 per cent of the total compensation for the services. The petitioner, to prevail, must disprove both points. *168 The petitioner contends that the period from the beginning to the completion of the services was five calendar years or more, as the services began in January 1932 and were not completed until 1940; that, although the fee was awarded in 1936 for services previously performed, the petitioner's continued services in 1937 and later were necessary to the earning of the fee because the receivers did not comply with the order of the court directing them to carry out the settlement and petitioner had to take legal steps to enforce compliance, and that until the receivers did carry out the terms as directed by the court his work was incomplete and his contract with his clients was unfulfilled. The issue on this point is whether the fee received in 1940 was compensation solely for the services petitioner rendered prior to 1937 or was in any part compensation for services performed after the awarding and before the collection of the fee. The decision depends entirely upon the facts. Petitioner's claim filed in the receivership proceeding for allowance of compensation, was, as the court observed, "based on Warrick's services in negotiating the settlement with the Columbia companies." The *169 court took notice that "the substance of the settlement was the result of Warrick's work", and that he was entitled to substantial compensation. Compensation was allowed for these services because they benefited the receivership estate, converting it from an insolvent condition into one having net assets worth several millions of dollars. These services began early in 1932 and ended about April 1936 when the negotiated settlement was approved by the court. This was a period of less than five years. Some of petitioner's activities in 1937 and later years had to do with effecting collection of the fee, rather than in earning it. He found it necessary to take the issue of payment to the Supreme Court of Delaware before he could force the receivers to pay him. These activities were in his own interest and were not for the benefit of the estate in receivership. The issue depends upon the status of the services performed in 1937, 1938 and 1939 which were directed to resisting attempts to modify the approved settlement and to requiring the distribution to the stockholders of Mokan of the warrants entitling them to subscribe to a new issue of Panhandle Eastern stock. An important circumstance *170 to be considered in resolving this issue is that petitioner had acquired some stock of Mokan after the settlement was approved and before these later services were performed. He was in a position to know the true worth of Mokan stock and had found an opportunity to acquire some shares. The warrants to subscribe at $25 to stock having a market value of $50 or $60 had a substantial value to him as a stockholder of Mokan and it was of great concern to him that the settlement be carried out as negotiated in order that he might realize upon his investment to the fullest extent. After he had forced compliance with the terms of the settlement he exercised his rights by purchasing Panhandle Eastern stock. The services performed in enforcing the terms did not bring assets into the receivership estate, as did the services for which the award of compensation was made. Had he not acted to enforce the terms of the settlement, the consequence would be that he might be deprived of some of his rights as a stockholder of Mokan. Undoubtedly other stockholders benefited from his action, but under the circumstances it is reasonable to believe that he acted primarily to assert his own rights rather than *171 to carry out any duty he may have considered that he owed to other stockholders. Furthermore, petitioner's action in this matter had nothing to do with "negotiating the settlement with the Columbia companies," the service for which the compensation was allowed. It does not appear that the Columbia companies had failed to carry out the terms agreed upon. Certain of Mokan's stockholders were attempting to have the terms changed and the receivers did not at first carry them out. Petitioner's services in opposing these stockholders and the receivers were not within the scope of services for which the compensation had been allowed and was ultimately paid. Had petitioner refrained from performing the later services he would still have been entitled to collect the fee awarded for negotiating the settlement. We conclude that the compensation was received for services covering a period of less than five years and, therefore, section 107 may not be applied in computing the petitioners' tax for 1940 attributable to the compensation. In view of this conclusion it is not necessary to decide whether the payment of $125,000 in 1940 was at least 95 per cent of the total compensation for the services. *172 Decision will be entered for the respondent. Footnotes
1. SEC. 107. COMPENSATION FOR SERVICES RENDERED FOR A PERIOD OF FIVE YEARS OR MORE. In the case of compensation (a) received, for personal services rendered by an individual in his individual capacity, or as a member of a partnership, and covering a period of five calendar years or more from the beginning to the completion of such service, (b) paid (or not less than 95 per centum of which is paid) only on completion of such services, and (c) required to be included in gross income of such individual for any taxable year beginning after December 31, 1938, the tax attributable to such compensation shall not be greater than the aggregate of the taxes attributable to such compensation had it been received in equal portions in each of the years included in such period.↩